IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DONALD BUZZ FREE,                                          Civ. No. 1:12-cv-00601-AC

                            Plaintiff,                              OPINION AND
                                                                          ORDER
            v.

COMMISSIONER, Social Security
Administration,

                            Defendant.

_____

ACOSTA, Magistrate Judge:

        Claimant Donald Buzz Free ("Claimant") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("SSA") and for Supplemental Security

Income ("SSI") disability benefits under Title XVI of the SSA.  *See* 42 U.S.C. §§ 401-433 and

§§ 1381-83f (2010).  This court has jurisdiction to review the Commissioner's decision pursuant to

42 U.S.C. § 405(g). Following a careful review of the record, the court reverses the decision of the ALJ and remands the matter for an award of benefits.

*Procedural History*

Claimant filed for DIB and SSI benefits on November 14, 2007, and November 13, 2007, respectively, alleging a disability onset date of January 5, 2006. The claim was denied initially and on reconsideration. On November 10, 2009, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a decision on November 20, 2009, finding Claimant not disabled. Claimant requested review of this decision on January 15, 2010. The Appeals Council denied this request, making the ALJ's decision the Commissioner's final decision. Claimant filed for review of the final decision in this court on April 5, 2012.

*Factual Background*

In his application for benefits, Claimant reported that his limitations were caused by scoliosis, degenerative back disease, and heart disease, which collectively prevented him from being on his feet for an extended period of time. (Tr. 137.) Prior to the onset of his alleged disability, from 1984 to November 2005, Claimant worked as a chef, cook, server, and bartender. (Tr. 166.) Claimant worked forty or more hours per week and was unlimited in his ability to walk, stand, sit, and otherwise physically navigate the tasks required by his position. (Tr. 167.)

On June 1, 2005, Claimant saw Dr. D. Brad Jones, M.D. ("Dr. Jones"), who examined Claimant and diagnosed him with significant thoracic scoliosis. (Tr. 322.) He wrote: "He is requesting disability at his first visit. I will not grant disability." (Tr. 322.) Dr. Jones stated that he would refer Claimant to an "adult scoliosis surgeon" and opined that if Claimant's "curve progresse[d] he [would] need major anterior and posterior corrective surgery." (Tr. 322.)

On June 24, 2005, Claimant was seen by Martin Dawson, FNP ("Dawson"), at Anderson Medical Associates. Claimant reported experiencing lower back pain and some upper back pain for the previous two or three months. Claimant stated that he intended to apply for disability benefits and was also seeking medication. He was advised to continue taking ibuprofen, to avoid overusing his back, to apply a warm compress in the evening, and was prescribed Baclofen. Dawson diagnosed Claimant with scoliosis and muscle spasms. (Tr. 229.) Claimant returned for a follow-up appointment on July 8, 2005, and reported continued pain, difficulty sleeping, and that he had discontinued use of Baclofen. (Tr. 226.) At a subsequent follow-up appointment, on July 22, 2005, Claimant reported serious side-effects from Baclofen and declined to try a different dose. He also stated that he was not doing stretching exercises, that he wanted medication to help him sleep, and denied symptoms of depression. (Tr. 224.)

Claimant saw Dr. Gregory White, M.D. ("Dr. White"), several times in 2006. Dr. White's notes are substantially illegible and the court is reluctant to draw conclusions based on the limited information discernible therein. *See* Tr. 230-237.

On May 30, 2007, Claimant saw Dr. Danny Stills, M.D. ("Dr. Stills"), who diagnosed Claimant with scoliosis and thoracic spine pain. He recommended that Claimant use heating pads and ice packs, to avoid activities that strain the back, to take medication as directed, and to consider the need for further tests and possibly surgery. At a follow-up appointment on June 22, 2007, Dr. Stills noted a "marked convexity" to the spine, tenderness of the spine on palpation, and a normal gait. Dr. Stills wrote: "It is clear that you should be seen by surgical doctors since this is not a condition that should be treated with pain medications alone." (Tr. 238.) The notes also show that Claimant was prescribed Diazepam to be taken "[three] times daily as needed for nerves[.]" (Tr.

238.)

Claimant saw Dr. Gary M. Lam, M.D. ("Dr. Lam"), at least twice in 2007. Claimant reported to Dr. Lam that he developed thoracic scoliosis as a teenager, but it did not negatively impact him until recent years when he developed more serious "back pain at the upper lumbar spine." (Tr. 243.) Claimant stated that he had been taking Methadone as prescribed by Dr. White but did not wish to continue using it. Upon examination of Claimant, Dr. Lam noted an increased thoracic curvature since a 2005 x-ray. Dr. Lam predicted a "slight risk" that as Claimant aged his scoliosis would progress and recommended physical therapy, but not injections or surgical intervention. At the time, Claimant was planning to move and was given a one-time prescription for Vicodin, as "medication to help him through painful days." (Tr. 244.) At a follow-up appointment on July 3, 2007, Claimant reported that physical therapy made his back pain "slightly better" and that he "[was] able to function at a slightly higher level." (Tr. 241.) Dr. Lam stated that Claimant should continue to follow his physical therapy regimen and should monitor his condition with a new x-ray every few years. (Tr. 241.)

Claimant began seeing Dr. Warren J. Rehwaldt, M.D. ("Dr. Rehwaldt"), on August 6, 2007. Upon examining Claimant's back, Dr. Rehwaldt observed a "marked scoliotic curvature" and prescribed "low-dose Vicodin" with plans to reassess at a follow-up appointment. (Tr. 252.) Claimant returned for a follow-up on October 11, 2007, at which time Dr. Rehwaldt discussed Claimant's medications with him and determined that the current dose of Vicodin was effective and was being used properly. (Tr. 246.)

Beginning in October 2007, Claimant received physical therapy from Brad Kelly PT ("Kelly") for his back pain at Coastal Physical Therapy. At the time of his initial evaluation,

Claimant reported moderate to severe limitation in performing activities of daily living ("ADLs") and rated his pain when at rest as two on a scale of ten and with activity as nine out of ten. A review of Claimant's physical therapy records between October 24, 2007, and April 23, 2007, reveals steady and significant progress in reducing the characteristics of his back pain. On November 21, 2007, Claimant reported that he was getting stronger and improving his range of motion, though his pain increased when he slept in an irregular position. On November 29, 2007, Kelly wrote that Claimant was "responding well to therapeutic exercises" and was planning to get a TENS unit[1] for his home to help reduce his reliance on medication. (Tr. 295.) Furthermore, the report states that Claimant's pain level had improved from moderate-severe to merely moderate in performing ADLs and recreational activities. (Tr. 292.) On January 3, 2008, Claimant's pain was assessed as two of ten while at rest and seven of ten when active, a reduction from the nine of ten initially reported. (Tr. 291.)

Improvement continued throughout the month and, on January 23, 2008, Kelly wrote: "States he is noticing good improvement in how his back feels since beginning his exercises. States it still bothers him intermittently, but not with the intensity that it used to." (Tr. 285.) On February 5, 2008, Claimant's pain when active was rated at six of ten, down from seven of ten in January 2008. Claimant's pain level was again reduced on March 7, 2008, to five of ten. On March 10, 2008, Kelly commented: "States he is increasing his independent exercise frequency to 4 times weekly and is almost never having any bouts of back pain now." (Tr. 275.) Finally, on April 23, 2008, Claimant's pain when active dropped to four of ten, on a scale of ten. At that time, Claimant

---

[1] TENS is "[a] technique used to relieve pain in an injured or diseased part of the body in which electrodes applied to the skin deliver intermittent stimulation to surface nerves, blocking the transmission of pain signals." THE AMERICAN HERITAGE DICTIONARY 1794 (5th ed. 2011).

informed Kelly he was moving to Ashland, Oregon, to attend Southern Oregon University ("SOU") and the therapy relationship terminated.  (Tr. 272.)

On October 2, 2008, Claimant visited the SOU Student Health & Wellness Center ("SOU Health Center") and was evaluated by Dr. Lorraine McDonald ("Dr. McDonald").  He complained of lower back pain caused by scoliosis and disc deterioration and reported that it was improved by physical therapy and medication.  Claimant reported that, at the time of his appointment, he was experiencing pain equal to a four on a scale of ten, but that his pain, at its worst, was a ten.  Dr. McDonald recounted his history, as reported by Claimant, and wrote a note that reads:  "is very active, backcountry skiing, mountain biking, snow camping."  (Tr. 334.)  Dr. McDonald found Claimant in "great health" but for his scoliosis and chronic pain, and referred him to a physical therapist.

On October 16, 2008, Claimant again reported to the SOU Health Center, and was seen by Janet Reavis, FNP ("Reavis").  Claimant stated that his back pain had increased to an unprecedented level, and he feared it might be related to his kidneys.  He also sought a renewed prescription for Vicodin, but was referred to the terms of his medication agreement with Dr. McDonald which stated that only Dr. McDonald would write him prescriptions for pain medication.  After examining Claimant, Reavis concluded that Claimant did not have a kidney infection and released him without performing a urinalysis, at least in part because Claimant stated he could not produce a sample at that time.  (Tr. 333.)

On November 20, 2008, Claimant requested medical withdrawal from classes at SOU, the result of missing too many classes due to back pain.  (Tr. 331.)  Dr. McDonald filled out the physician portion of the withdrawal request, noting that Claimant had missed classes because he was

bedridden, that his condition had "retrogressed," and that he only attended physical therapy one time, on October 20, 2008. (Tr. 330.) Dr. McDonald also examined Claimant in conjunction with his withdrawal and confirmed that he was withdrawing because of back pain that caused him to miss classes. (Tr. 328.)

In May 2009, Dr. McDonald filled out a questionnaire regarding Claimant's RFC, based on four visits with Claimant between October 2008 and May 2009. She described his prognosis as "permanent and likely to worsen over time." (Tr. 339.) Her conclusions were based on medical records provided by Claimant and confirmed by a physical examination. She described his pain as characterized by aching but progressing to sharp pain, constant and daily, with occasional foot cramping, and a severity of four to six on a scale of ten, occasionally increasing to eight of ten, causing Claimant to be bedridden. (Tr. 339.) Dr. McDonald described the side effects of Claimant's pain medication, including drowsiness, nausea, constipation, and impaired concentration. (Tr. 340.) Dr. McDonald also described Claimant's limitations: Claimant can walk three to four city blocks without rest or severe pain; he is able to sit and stand for about two hours in an eight-hour workday; he must walk once per hour for fifteen minutes; he must be able to shift positions and take unscheduled breaks, every hour for fifteen minutes; and he would need to take more than four days off per month. (Tr. 340-342.) Dr. McDonald's conclusions were based on her examination of Claimant that same day, and her notes describe Claimant's condition in greater detail. (Tr. 345-346.) On June 1, 2009, Dr. McDonald wrote a note on a prescription pad which stated that Claimant was unable to work. (Tr. 317.) Claimant again visited Dr. McDonald on October 29, 2009, and reported continued back pain. McDonald noted that Claimant frequently drove to neighboring cities to visit and assist his elderly parents. (Tr. 369.)

Dr. Linda L. Jensen, M.D. ("Dr. Jensen"), evaluated Claimant's medical records in order to assess his RFC. She concluded that Claimant could occasionally lift twenty pounds, frequently lift ten pounds; stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday; and do unlimited pushing and pulling. (Tr. 259.) With regard to postural limitations, Dr. Jensen indicated that Claimant could frequently balance, kneel, and crawl; and could occasionally climb, stoop, and crouch. (Tr. 260.) She did not recognize any manipulative, visual, communicative, or environmental limitations on Claimant. Dr. Jensen went on to summarize Claimant's medical records and concluded that Claimant did not meet or equal a listing.

On July 30, 2008, Dr. Martin Kehrli, M.D. ("Dr. Kehrli") issued a summary of Claimant's medical records and his own conclusions regarding Claimant's condition. He affirmed the existing RFC, noting that Claimant was engaged in physical therapy with "good effects" and his ADLs, which include walking, doing school work, and going to the gym and library, indicate that he is capable of light function. (Tr. 315.)

Claimant filled out a "Claimant Pain Questionnaire" on December 30, 2007. He stated that he experienced back pain on a daily basis, continuously so long as he was awake. The pain was worsened by "stress, fatigue, lack of sleep, too much sitting, standing, twisting[,] bending[,] lifting." (Tr. 174.) The pain was improved by "medication - light exercise, warm & cold packs, showers, sleep, rest." *Id.* Claimant reported taking Vicodin and ibuprofen for the pain as needed, or four to five times per day. According to Claimant's questionnaire, he was capable of being active for one to two hours before needing to rest, and was precluded from activities that required constant "lifting, stairs, sitting, standing." (Tr. 175.) In response to a question regarding activities he used to enjoy but can no longer perform, Claimant listed "Backpacking, mountaineering, waterskiing, raquetball,

tennis, golf." (Tr. 175.) Claimant indicated that he could walk up to one mile without resting, groom himself without assistance or breaks, prepare his own meals, perform household chores (though he required help with more strenuous cleaning), drive occasionally, and engage in hobbies or pastimes for one to two hours before resting. (Tr. 176.)

Claimant also filled out a document entitled "Function Report – Adult" on December 30, 2007. He reported daily activities that included bathing, household chores, studying, errands, physical therapy, and other sedentary activities. (Tr. 177.) Regarding meal preparation, Claimant stated that he prepared simple meals for himself and that this took him between fifteen and thirty minutes per day. He stated that he could perform light housework tasks, but only for fifteen to twenty minutes before requiring rest, and that he needed help lifting and carrying things, and performing tasks that require long periods of sitting. (Tr. 179.) Claimant cited his interests as reading, walking on trails, and fishing, and stated that he used to enjoy hiking, skiing, and mountaineering. (Tr. 181.) He stated that his pain prevents him from longer walks and generally restricts his mobility. When asked to list places he goes regularly, Claimant wrote that he goes to physical therapy, the gym, the library, stores, the beach, and the park. (Tr. 181.)

Claimant reported no difficulty following instructions and that he could lift up to thirty pounds, but that he could concentrate for only two to three hours, stand for forty to fifty minutes, walk for forty-five minutes without resting for one to two hours, and sit for twenty to thirty minutes. (Tr. 182.) He further reported that his limitations cause him pain, stress, lack of sleep, concern for his financial situation and his elderly parents. To assist him in tolerating his back pain, Claimant uses a back brace, heating pads, and ice packs; he also requires reading glasses when the pain is particularly bad. (Tr. 183.) Claimant also expressed his desire to resume the recreational activities

he once engaged in, to have increased independence, and more financial security.  (Tr. 184.)[2]

An administrative hearing was held on November 10, 2009.  Claimant testified as follows. He stopped working in 2004 or 2005 because his back pain prevented him from meeting the physical demands of the job.  (Tr. 41.)  He currently takes Vicodin, ibuprofen, and aspirin to control his pain, but the pain persists and has worsened over time.  (Tr. 42, 44.)  He drives to Reading, California to visit his mother who herself cannot drive, and states that upon arrival at her house, he must immediately lie down to relieve the pain.  (Tr. 45-46.)  Claimant attempted to ride his bike a few months ago, but had to get off and push the bike home.  (Tr. 46.)  When questioned about Dr. McDonald's chart note that suggested Claimant continues to engage in recreational activities like skiing and mountain biking, Claimant stated that he had not done those things in years.  (Tr. 46.) Claimant is capable of performing household chores and managing his finances.  (Tr. 47.)  He needs to lay down approximately every two hours and stated that the pain is itself fatiguing.  (Tr. 48, 52.) While he was attending school, Claimant had difficulty carrying his books.  (Tr. 55.)

A vocational expert ("VE") also testified at the hearing.  The ALJ questioned the VE regarding jobs available for persons with a hypothetical set of limitations.  First, the ALJ questioned the VE regarding a hypothetical individual with Claimant's past relevant work who is limited to occasional climbing of stairs, ladders, ropes, and scaffolds, occasional stooping and crouching, and frequent balancing, kneeling, and crawling.  The VE testified that this individual would be able to perform work as a food server, office helper, table worker, and small-products assembler.  (Tr. 60-61.)  Second, the ALJ questioned the VE regarding an individual with the same limitations as above,

---

[2] A "Function Report – Adult – Third Party," filled out by Claimant's mother, Evelyn Free, is almost unreadable as reproduced in the administrative record.  Its contents are not at issue, however, and the court will not attempt to decipher its content.  (Tr. 186-193.)

but with a further limitation to sedentary work, the ability to shift positions hourly from standing to sitting, and overhead reaching limited to occasional with the right hand and frequent with the left. The VE testified that such an individual would be able to work as a sedentary table worker, an assember, and an envelope addresser. (Tr. 61-62.) Third, the ALJ questioned the VE regarding a hypothetical individual with the same limitations as the second hypothetical individual but with the additional requirement that the position permit the individual to recline for two hours in an eight-hour workday. The VE testified that such an individual would not be competitively employable. (Tr. 62.) Fourth, the ALJ questioned the VE regarding a hypothetical individual who missed four days of work per month. The VE stated that such individual would not be competitively employable. (Tr. 62.)

Claimant's counsel also questioned the VE at the administrative hearing. He asked the VE if an individual that had to brace himself while standing or sitting for one-third of the workday would be able to perform any of the jobs the VE had mentioned in response to the ALJ's hypotheticals. The VE responded that the jobs she listed would require frequent, bimanual activity throughout the day and therefore would not apply to an individual with the additional bracing limitation. Claimant's counsel also clarified that a hypothetical individual who missed only two days per monthwould not be competitively employable. The VE also testified that each of the jobs listed would require attention and concentration throughout the course of the workday, and a person with an attention deficit who could not maintain the requisite production level would be easily replaced.

*Legal Standard*

This court must affirm the Commissioner's decision if it is based on proper legal standard

and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Andrews*, 53 F.3d at 1039-40. The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews*, 53 F.3d at 1039. In determining a claimant's residual functional capacity ("RFC"), an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

*Summary of the ALJ's Findings*

The ALJ engaged in the five-step "sequential evaluation" process when she evaluated Claimant's disability, as required. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

I.    Steps One and Two

At Step One, the ALJ concluded that Claimant had not engaged in any substantial gainful activity since the onset of his alleged disability.  (Tr. 23.)  At Step Two, the ALJ determined that Claimant had the following severe impairments:  scoliosis and degenerative disc disease.  (Tr. 23.) The ALJ also determined that Claimant had the following non-severe impairments:  allergies and a heart murmur.  (Tr. 23.)  The ALJ's specific findings as to each impairment are detailed below.

A.    *Scoliosis*

Claimant's history of scoliosis dates back to Claimant's teenage years, but his condition became symptomatic only in approximately 2005.  Between May and August 2006, Claimant rated his pain between three and four on a scale of ten, reported improvement, and reported that his pain was under control.  In July 2007, Claimant reported his scoliosis as slightly improved, and Dr. Lam recommended he obtain an x-ray every two or three years to monitor his condition.  In a December 2007 function report, Claimant stated that he could walk for one to two hours, could lift twenty-five to thirty pounds, was able to perform household chores, cook, and shop, and stays busy with activities.  Between April and October 2008, Claimant responded well to physical therapy and ultimately reported that his pain during activity was between three and four on a scale of ten.

Claimant testified that his scoliosis became worse over time.  As Claimant's condition was relatively recent, this indicated only mild symptoms.  Claimant first dropped out of school in November 2008, with the intent to return, and in May 2009, he was bedridden only occasionally. In January 2009, Claimant was released to return to school without restrictions.

The ALJ also noted that some doctors have recommended surgery for Claimant's scoliosis, while others have not.

B.    *Degenerative Disc Disease*

The ALJ does not make a meaningful distinction between scoliosis and degenerative disc disease, and thus the findings here are presumed identical to those for scoliosis.

C.    *Allergies*

The ALJ noted that Claimant does not allege any functional limitations associated with this non-severe impairment. Claimant takes medication for his allergies, including the occasional use of Benadryl.

D.    *Heart Murmur*

Claimant attributes his decision not to have surgery on his back, in part, to the risks associated with the surgery and his heart murmur. Claimant has not, however, presented objective medical evidence of this risk and he does not allege any functional limitations caused by the heart murmur.

II.    <u>Step Three</u>

At Step Three, the ALJ determined that Claimant's impairments did not meet or medically equal a listing as set forth in the regulations, specifically Listing 1.04. Listing 1.04 describes the requirements for "[d]isorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1. To establish that he or she meets this listing, the disability claimant must satisfy part (A), (B), or (C) of Listing 1.04. The ALJ concluded in summary fashion that the objective record evidence did not establish any of the above requirements were met and thus concluded that Claimant did not meet a listing.

III.    <u>Claimant's RFC</u>

The ALJ concluded that Claimant had the following RFC: "He can occasionally climb ramps, stairs, ladders, ropes, or scaffolds. He can frequently balance. He can occasionally stoop.

He can occasionally reach overhead with his right upper extremity.  He can frequently reach overhead with his left upper extremity.  He must have a sit/stand option to stand for one minute for each hour of sitting." (Tr. 25.)

IV.    Step Four

At Step Four, the ALJ concluded that Claimant could not perform past relevant work as a cook or a food server.  (Tr. 28.)

V.    Step Five

At Step Five, the ALJ concluded that Claimant was capable of performing other work that exists in substantial numbers in the national economy.  (Tr. 28.)  Specifically, the ALJ concluded that Claimant was capable of working as a table worker, assembler, or an addresser, and each position exists in significant numbers in the national economy.  (Tr. 29.)

*Discussion*

Claimant argues that the ALJ erred in five specific ways:  (1) improperly rejecting the opinion of a treating physician; (2) substituting his own opinion for that of a treating physician; (3) rejecting Claimant's testimony as not credible; (4) failing to consider the record as a whole; and (5) giving the VE incomplete hypotheticals and relying selectively on the VE's testimony.  Claimant argues that the case should be remanded for an award of benefits as there would be no benefit to further proceedings.  The Commissioner opposes these assignments of error and contends that the ALJ's decision should be affirmed.

I.    Treating Physician Opinion

Claimant objects to the ALJ's handling of the opinion of Dr. McDonald, a doctor who treated Claimant at the SOU Health Center from approximately October 2008 to October 2009.  In the

decision, the ALJ gave little weight to Dr. McDonald's opinion because the ALJ found her conclusions at odds with her own therapeutic history with Claimant. In particular, the ALJ cited an observation by Dr. McDonald in May 2009, that Claimant had full (or "5/5") strength overall and full range of motion, and treatment notes from 2008 that indicate improvement. The ALJ also objects, in a footnote, to Dr. McDonald's June 2009 note which states that Claimant is unable to work and not fit for employment. This, the ALJ contends, is an opinion on the ultimate issue, the determination of which is reserved for the Commissioner.

Claimant contends that the ALJ's reasons are inadequate as the ALJ failed to explain or substantiate with evidence the assertion that Dr. McDonald's opinions regarding Claimant's functional limitations are at odds with her treatment notes. Claimant argues that this amounts to the ALJ substituting his opinion for that of a medical provider, a practice not permitted under the SSA. Furthermore, Claimant argues that the ALJ gave greater weight to the opinions of examining and non-examining physicians without giving sufficient reasons to elevate these opinions above those of Dr. McDonald.

The Commissioner responds that Dr. McDonald's opinion was controverted by other medical providers and the ALJ needed only give specific and legitimate reasons to reject her opinion. The Commissioner relies on the chart note that stated Claimant "is active" in various outdoor recreational activities, and points out that Dr. McDonald used the past tense appropriately in other instances. The Commissioner argues that the court should not substitute its opinion for that of the ALJ where the ALJ's opinion is a reasonable interpretation of the evidence.

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Commissioner*

*Social Security Administration*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In general, the opinion of a treating physician is entitled to controlling weight if well-supported and consistent with underlying evidence: "[A]n ALJ may not reject treating physicians' opinions unless he 'makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Smolen v. Chater*, 80 F.3d 1273, 1285 (1996) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). Where the opinion is uncontroverted, the ALJ must give clear and convincing reasons to reject the opinion of the treating physician. *Id.*

As an initial matter, the court agrees with the ALJ that Dr. McDonald's note stating that Claimant is unable to work is not entitled to controlling or special weight. As the Ninth Circuit wrote: "A treating physician's evaluation of a patient's ability to work may be useful or suggestive of useful information, but a treating physician ordinarily does not consult a vocational expert or have the expertise of one. An impairment is a purely medical condition. A disability is an administrative determination of how an impairment . . . affects ability to engage in gainful activity." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2012). Thus, the note does not control the disability determination, though it may inform it.

In rejecting Dr. McDonald's conclusions, the ALJ cites the opinions of Drs. Jensen and Kehrli as contradicting the opinion of Dr. McDonald. Dr. Jensen reviewed Claimant's medical records from between May 2007 and January 2008, a nine-month period, and concluded that Claimant was capable of performing light work, specifically noting Claimant's ADLs. Dr. Kehrli reviewed records through June 2008 and concurred with Dr. Jensen's assessment. Thus, as Dr. McDonald's opinion does not accommodate the ability to engage in light-duty work, it is at odds

with those of Drs. Jensen and Kehrli and is, thus, controverted. Accordingly, the ALJ must give specific and legitimate reasons to reject that opinion, and the ALJ states that the internal inconsistencies in Dr. McDonald's reports and notes are the basis for this rejection.

The court, however, cannot discern the purported inconsistencies between Dr. McDonald's opinion and her treatment notes. The ALJ's characterization of Dr. McDonald's opinions and notes is abbreviated and incomplete. The ALJ fails to explain how a positive test for strength and range of motion undermine the limitations imposed by Claimant's back pain, and, although Dr. McDonald noted improvement in 2008, she also noted "retrogression" of Claimant's symptoms at the end of 2008. Thus, the reasons given lack the specificity and legitimacy required to reject the conclusions of a treating physician, and the ALJ has failed to justify the rejection of Dr. McDonald's testimony.

Claimant argues that Dr. McDonald's conclusions should be credited as true. This issue is addressed below in the section regarding remand.

## II.    Claimant Credibility

Claimant argues that the ALJ incorrectly rejected his testimony as not credible without giving clear and convincing reasons. In the administrative decision, the ALJ gave several reasons to question Claimant's credibility. First, Claimant's statement that he had to lie down repeatedly throughout the day was at odds with his claimed ADLs – doing housework, climbing stairs, bending, and reaching – and his statement in May 2009 that he could sit or stand for one hour and walk for two hours. Second, Claimant twice withdrew from classes citing back pain as the cause, but both times he anticipated he would return the following term, in 2008 his pain level was in the low-to-medium range, and in May 2009 he claimed that he was only occasionally bedridden. Third, during his first visit with Dr. Jones, Claimant asked Dr. Jones to deem him disabled, which request was

denied.  Fourth, Claimant stated that he was previously advised that surgery would be too risky in light of its invasiveness, but Dr. Lam did not recommend surgical intervention or mention risks that would preclude surgery.  Fifth, Dr. McDonald wrote in her notes that Claimant was currently active in outdoor sports and other recreational activities.  Sixth, Claimant has testified that his pain is always present, but also that medication helps his pain.

Claimant argues that none of these reasons are legitimate and they fail to justify the ALJ's conclusion that Claimant is not credible.  Claimant first argues that requesting a disability finding from a medical professional is not a legally recognized basis for finding a claimant not credible.  In fact, Claimant argues, Dr. Jones's report corroborates Claimant's pain testimony and contains no indication that he found Claimant not credible.  Claimant also objects to the ALJ's analysis regarding his need for surgical intervention, arguing that there is no actual inconsistency that would tend to diminish Claimant's credibility, and this too falls short of a clear and convincing reason to characterize Claimant as not credible.  Claimant argues that the clear weight of the record evidence supports Claimant's contention that he can no longer engage in the recreational activities he used to enjoy, and the ALJ's claim that Dr. McDonald's notes demonstrate that Claimant still engages in those activities is a misrepresentation of the record.  Claimant points out that the note was made under the heading "subjective" and it was the second-hand report of a witness that was not called to testify or otherwise contacted to clarify the ambiguity.  Further, Claimant urges, the great weight of the record evidence makes clear that Claimant can no longer engage in such activities and Dr. McDonald's use of the present tense was either unintentional or in error.  Claimant next argues that there is no contradiction where a claimant takes medication that ameliorates the symptoms, but still experiences chronic pain.  Claimant also argues that the ALJ drew selectively from Claimant's

Function Report from December 2007, reciting the many limitations described therein. Claimant also objects to the ALJ's insinuation that Claimant engages in all of the listed activities on a daily basis, rather than recognizing those activities as the types of activities Claimant is able to engage in but nonetheless limited in by his chronic pain. Finally, Claimant objects to the ALJ's reasoning that, because Claimant's condition became symptomatic only in approximately 2005, a steady worsening over time may produce mild symptoms, rather than the debilitating symptoms to which Claimant presently attests.

The Commissioner responds in summary fashion that the ALJ's reasons for discounting Claimant's credibility were clear and convincing.

"Once a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)) (internal quotation marks omitted). If the ALJ finds the subjective complaints less than credible, the ALJ must make specific findings that support that conclusion. "[T]he findings 'must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit [the] claimant's testimony." *Id.* at 856-57 (quoting *Bunnell*, 947 F.2d at 345). In the absence of evidence that the claimant is malingering, the ALJ must give "clear and convincing reasons for rejecting the claimant's testimony regarding the severity of symptoms." *Id.* at 857 (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988)).

The ALJ's discussion must be specific enough to allow the reviewing court to determine that the ALJ did not arbitrarily discredit the claimant's testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345

(9th Cir. 1991).  An ALJ may rely on the following factors to make a credibility determination: ordinary techniques of credibility evaluation; objective medical evidence and medical opinion; claimant's inconsistent statements; daily activities; work record; and claimant's medical treatment and the effectiveness and side effects of medication.  20 C.F.R. § 416.92(c).  The court may not second-guess the ALJ's credibility determination if it is supported by substantial evidence.  *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002).

First, the parties agree that there is objective medical evidence that could reasonably produce Claimant's symptoms.  Second, the ALJ made no affirmative finding of malingering and thus the ALJ must provide clear and convincing reasons for rejecting Claimant's testimony.  The court finds that the ALJ's reasons for rejecting Claimant's testimony as not credible are insufficient.  The ALJ gives several examples of inconsistencies between Claimant's conduct, testimony, and medical records, none of which are supported by substantial evidence.  The ALJ's first example, that Claimant's reported ADLs are inconsistent with his testimony that he must lie down after engaging in physical activity, fails to establish an actual inconsistency.  Claimant's ability to perform household chores, climb stairs, bend, and reach is not inconsistent with his claim that he must lie down after engaging in physical activity.  The same is true for Claimant's representation to Dr. McDonald:  "He has daily, constant pain and a 4-6/10 range increasing to an 8 on occasion and he is occasionally bedridden.  He cannot sit in one place for greater than an hour, walk for greater than two hours or stand for greater than an hour without precipitating more severe pain." (Tr. 346.)  This evidence is not inconsistent with Claimant's statement that he needs to lie down after engaging in physical activity.

The second example given by the ALJ is similarly deficient.  The ALJ notes that, in

November 2008, Claimant elected to withdraw from school due to pain, but that he had reported low- to mid-level pain earlier in the year and was released to return to classes in January 2009. The ALJ also notes that, in May 2009, Claimant reported that he was only occasionally bedridden. However, viewing the record as a whole, it is reasonably evident that Claimant experienced improvement while receiving physical therapy in 2008, but that the therapy ceased when he moved and began classes at SOU. Furthermore, Dr. McDonald only prospectively predicted Claimant's release to return to classes in January 2009. The ALJ fails to mention that Dr. McDonald also wrote that Claimant would be unable to attend classes for an unspecified period of time as he was "bed-ridden for days at a time." (Tr. 330.) Dr. McDonald also stated on the withdrawal form that Claimant's condition had retrogressed. Thus, the information cited by the ALJ is not contradicted.

The ALJ's third example of Claimant's lack of credibility is a purported inconsistency between what Claimant testified he was told several years ago about the potential for back surgery and the recommendation of Dr. Lam. However, that Claimant received differing recommendations regarding his future need for surgery does not amount to an inconsistency on his part or undermine his credibility.

The ALJ's fourth example of inconsistency is between Claimant's testimony that he cannot engage in more strenuous recreational activities like backcountry skiing, mountain biking, and snow camping, and Dr. McDonald's chart note that Claimant "is very active, backcountry skiing, mtn. biking, snow camping." (Tr. 334.) Viewing the record as a whole, it is evident that Dr. McDonald's use of the present tense was either inadvertent or mistaken.

Finally, the ALJ states that Claimant's request that Dr. Jones give his opinion that Claimant was disabled "goes to claimant's credibility." (Tr. 26.) The ALJ does not explain how this request

impacts the credibility analysis and the court, in its review, finds no legal authority for this proposition.  In isolation, this request does not undermine Claimant's credibility.

For the reasons stated, the court concludes that the ALJ erroneously rejected Claimant's testimony regarding the intensity, persistence, and limiting effects of his pain.

III.    Vocational Expert Testimony

Claimant argues that the VE received an incomplete description of Claimant's limitations and, additionally, that the ALJ relied selectively on the VE's testimony in finding Claimant disabled. Claimant identifies five limitations that should have been included in the hypothetical presented to the VE.  First, Dr. McDonald stated that Claimant would miss four or more days per month and the VE testified that an individual missing two days per month would not be competitively employable. Second, Dr. McDonald stated that he would need to take a break every hour, and that after standing or sitting for a couple of hours, Claimant would need to lie down for an hour or more.  The VE testified that an individual needing to recline more than ninety minutes per day, the time typically devoted to a lunch hour and two fifteen-minute breaks, would not be competitively employable. Third, Claimant testified that, while sitting, he needs to brace himself with at least one of his arms most or all of the time.  The VE testified that the jobs identified for Claimant would require the use of both hands frequently throughout the day and, thus, an individual that needed to brace himself while sitting would not be employable in the identified jobs.  Fourth, Dr. McDonald stated that Claimant's pain would frequently interfere with his attention and concentration.  The VE testified that an individual with attention and concentration deficits that would impact productivity would not be competitively employable.  Fifth, Dr. McDonald stated that Claimant could sit for two hours and stand or walk for two hours in an eight hour workday, limiting Claimant to four hours of work

per day.  Claimant argues that this is less then the amount of time needed to establish substantial gainful activity.

The Commissioner argues that the ALJ presented hypotheticals to the VE that included all limitations the ALJ found to be supported by substantial evidence and, accordingly, appropriately relied on the testimony of the VE.

The court finds that, having erroneously rejected the opinion of Dr. McDonald and the testimony of Claimant, the ALJ's characterization of Claimant's limitations was incomplete and, therefore, erroneous.

IV.    Terms of Remand

Claimant requests that the court remand this decision for an award of benefits.  "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  In *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004), the Ninth Circuit set forth the framework for determining whether a remand for hearing or a remand for benefits is appropriate:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful.  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.

*Id*. at 594 (citations and emphasis omitted).  Evidence rejected by the ALJ should be credited and remand for benefits granted where:  "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000)).

Claimant argues that the court should credit the erroneously rejected medical opinion and testimonial evidence as true, and remand this case for an immediate award of benefits.  According to Claimant, because crediting the cited testimony as true would direct a finding of disability and no outstanding issues remain requiring resolution by the ALJ, an award for benefits is appropriate.  The Commissioner does not address this issue, maintaining instead that the ALJ's opinion should be upheld.

With respect to Dr. McDonald's opinion and Claimant's testimony, the ALJ failed to provide legally sufficient reasons to reject the evidence.  If this evidence is credited as true, a finding of disability is required because the limitations described therein would preclude Claimant from obtaining competitive employment.  This conclusion is supported by the VE's testimony given at the administrative hearing.  Finally, there are no outstanding issues that require resolution prior to a finding of disability.  As such, the legal standard for an immediate award of benefits is met.

*Conclusion*

For the reasons above stated, the Commissioner's decision is reversed and remanded for an award of benefits.

IT IS SO ORDERED.

DATED this 7th day of June, 2013.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge